[Crim. No. 1248.    In Bank.—October 7, 1905.]

## THE PEOPLE, Respondent, v. GEORGE EASTON, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE—VISITS TO HOUSE OF PROSTITUTION —HARMLESS RULING — MOTIVE. — Upon a prosecution for murder committed in a house of prostitution, where it was proved without objection that defendant was a frequenter of the house, an associate of the woman keeping it, had been ordered out of the house for disturbance therein, was jealous of other male associates of such woman, including the deceased, and had made threats against them, and had killed the deceased through jealousy, he could not be prejudiced by evidence of the number of times he had visited the house within the year preceding the trial.    Such evidence was admissible, in view of the facts shown, as bearing upon the motive for the crime, regardless of the fact that it incidentally and indirectly touched upon the chastity of the defendant.

ID.—DEFENSE OF INSANITY—TESTIMONY TO SANITY—APPLICABILITY OF REASONS—CROSS-EXAMINATION.—Where the defense was insanity, and a witness had testified without objection on cross-examination that he thought defendant, as he sat in the courtroom, capable of distinguishing right from wrong, and gave his reasons therefor, his whole testimony is to be taken together, and the reasons remaining in evidence are equally applicable to his further testimony on cross-examination that he thought defendant then capable of distinguishing right from wrong, and the court properly refused to strike it out, over an objection thereto, as not being proper cross-examination.

ID.—FLIGHT OF DEFENDANT — INSTRUCTION — QUESTIONS FOR JURY.— Where the defendant in fact fled from the scene of the homicide, it was proper to instruct the jury "that the flight of a person suspected of crime is a circumstance to be weighed by the jury, as tending in some degree to prove a consciousness of guilt, and is entitled to more or less weight according to the circumstances of the particular case."    Such instruction is not rendered inapplicable because of the defense of insanity, or because of defendant's declaration that he fled for fear of mob violence; it being for the jury to determine whether he was insane, and what was the motive of his flight.

—Though flight from a mob raises no presumption of guilt, yet the defendant cannot, by a self-serving declaration, establish that he fled because he feared mob violence, where no mob in fact existed, and it does not appear that he was fleeing from the vengeance of a mob.

APPEAL from a judgment of the Superior Court of Solano County and from an order denying a new trial. A. J. Buckles, Judge.

The facts are stated in the opinion of the court.

Paul C. Harlan, and L. T. Hatfield, for Appellant.

U. S. Webb, Attorney-General, for Respondent.

HENSHAW, J.—The defendant was informed against for the murder of one Charles J. Horigan, was found guilty of murder in the first degree, and sentenced to be hanged. From the judgment against him and from the order denying his motion for a new trial he appeals.

1. It is urged that the court, over defendant's objection, erroneously admitted testimony as to the number of times within the year preceding the trial that the defendant had been at the house of one Mrs. Quick, who was the keeper of a house of prostitution in the town of Dixon, Solano County, and in whose house the murder took place. The facts of the homicide were: That defendant, who had been a not infrequent visitor at the house of Mrs. Quick, and upon many occasions had slept there, was jealous of the woman and of her male associates, Horigan amongst the number. On the evening of November 2d he came to Mrs. Quick's house about eight o'clock. Horigan was eating supper with Mrs. Quick in the kitchen. The defendant sat down in the kitchen in sullen silence during the time Mrs. Quick, Horigan, and another woman were there. He asked Mrs. Quick for a razor. Mrs. Quick and Horigan went from the kitchen to another room. Horigan sat down, and Mrs. Quick was engaged in trimming the light of a lamp when defendant slipped from the kitchen into the room, drew Horigan's head back, and cut his throat with the razor. Defendant then fled from the scene, but surrendered himself to the authorities the next day. Horigan died from his wound. These facts were shown

in evidence without objection. It was further shown that, for another difficulty occurring in the same house of prostitution, Easton had been brought before the local magistrate and ordered to leave town, and did so. In like manner it was shown by the testimony of a barkeeper in the saloon opposite the place of the homicide that upon the Monday previous, speaking of the deceased, Horigan, and of other men, the defendant had said: "But she [Mrs. Quick] seems to think more of them than of me. I don't care a damn. I'll get even." And Mrs. Quick's testimony is, that after cutting Horigan's throat he turned to her and said: "Now I'll give you some of this. You are turning me down; and now I'll fix you." Much evidence of defendant's visits to the house had been admitted without objection. Finally an objection of defendant was addressed to the question: "How many times, during the last year, was the defendant at your house?" Defendant's objection to the question is based upon the ground that the answer affects and reflects upon his chastity, and that, as that was not an issue in the case, the ruling admitting the question was erroneous and prejudicial. Considering the facts that have been narrated above, it would seem that the answer to the question could not have been prejudicial to the defendant. As it was proved without objection that he was a frequenter of the house, an associate of the woman, had been ordered out of town because of a disturbance in her house, and killed Horigan, moved by no other rational motive than that of jealousy, no special injury could have been done under such circumstances by this evidence. Moreover, the question was proper in itself on the subject of motive. As the effort of the prosecution was directed to showing that the defendant murdered the deceased after previous threats because he had been the associate of this prostitute and was jealous of her favors to other men, as showing the nature and frequency of their intercourse, the question was permissible for its bearing upon motive, regardless of the fact that the answer incidentally and indirectly touched upon the chastity of the defendant.

2. The defense was insanity. A witness was asked if he thought the defendant then, as he sat in the court-room, was able to distinguish right from wrong in a particular act, and answered: "I don't know that, as he sits here in the court-

room now, he is able to distinguish right from wrong as to a particular act. I should think he is. The chances are that he has not had any of the drug." "Q. Do you think, or is it your opinion, that the defendant, at the present time, is able to distinguish between right and wrong?" (Objected to as not cross-examination.) *Witness.*—"I think he would now." It was ·not error for the court to refuse to strike out this last answer. The witness's whole testimony is to be taken together, and immediately before· this last answer he testified, without objection, that he thought the defendant was capable of distinguishing right from wrong, and gave his reasons therefor. Those reasons still remained in evidence and were as applicable to the answer last given upon the subject as to the first.

3. Defendant complains because the court gave an instruction as follows: "The flight of a person suspected of a crime is a circumstance to be weighed by the jury as tending in some degree to prove a consciousness of guilt, and is entitled to more or less weight according to the circumstances of the particular case." No attack is made upon the soundness of this instruction as a proposition of law, but it is said that under the facts of this case, where the defense was insanity, the giving of it was prejudicial to the defendant. Herein it is argued that, if one is insane when he commits a violent and unlawful act upon another, his immediate flight cannot affect the question of his legal responsibility. This is quite true; but it was for the jury to say whether or not the defendant was insane, and, if they so found him, his flight was of course meaningless. If he was not insane, then his flight had the significance which the law attaches to it. Appellant's objection to the instruction seems to arise from the mistaken notion that the court was bound in giving the instruction to adopt the theory that the defendant was in fact insane, whereas, of course, that was essentially and exclusively a proposition for determination by the jury. The second objection raised to the instruction is, that the testimony of the witness Eibe, to whom the defendant surrendered the next morning, shows that the defendant feared mob violence, and therefore fled. The testimony of Eibe is, that the defendant, whom he did not know, came to him the next morning, and told him that he had had a row in Dixon and thought

he had killed a man, but was not sure; that he thought he had killed him; that he used a razor; that he wanted to surrender, "and he said he would have surrendered that night had he not been afraid of the mob." Of course, flight from a mob raises no presumption of guilt. *(State* v. *Baker,* 110 Mo. 7, [19 S. W. 224, 33 Am. St. Rep. 414].) But the fallacy of appellant's argument upon this point in regard to the instruction is identical with that in the proposition last discussed. He in effect asks the court to accept as true the self-serving statement which he made the next day to Eibe. In fact there was no mob, and it was for the jury and not for the court to say what might have influenced his flight. Moreover, the defendant, who was a witness in his own behalf, nowhere declares that he fled for fear of a mob. His testimony is: "I don't remember a thing about the killing—not until afterwards. I ran away. After it was done, the excitement and everything, of course, I realized that I had done something, probably made trouble for me. . . . My mind was clear enough that night after this occurred to know that a wrong had been done, and a wrong which might result in my injury. I guess an hour or an hour and a half or two hours afterwards that realization came to me. I was crazy, I guess. Any man would be liable to go out of a house when he was crazy and wild. I suppose that is the reason I ran out of the house and ran away, and hid away—crazy from dope. I was under the influence of dope." Here again, under all the testimony, it was for the jury to say whether the defendant was suffering from temporary insanity and unconscious of what he was doing, as he testifies, or having committed a cold-blooded and bestial crime, with consciousness of his guilt, he fled from the scene of it. In no event does it appear that he was fleeing from the vengeance of a mob.

These are the propositions advanced for a reversal of the judgment and order, and as it appears that no one of them is tenable and that in no respect in his trial was any substantial right of the defendant impaired, it is ordered that the judgment and order appealed from be affirmed.

Beatty, C. J., McFarland, J., Lorigan, J., Shaw, J., Angellotti, J., and Van Dyke, J., concurred.